**ROCKY MOUNTAIN MICROSYSTEMS, INC., a Colorado corporation, Plaintiff,**

v.

**PUBLIC SAFETY SYSTEMS, INCORPORATED, a Virginia corporation, Defendant.**

No. Civ.A. 95–WM–726.

United States District Court, D. Colorado.

Jan. 13, 1998.

Richard Harring, Grimshaw & Harring, PC, Denver, CO, for Plaintiff.

Kevin Bridston, Holland & Hart, Denver, CO, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

MILLER, District Judge.

Following a two-day trial in this matter and the submission of arguments of the parties, I make the following factual findings and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

### FINDINGS OF FACT

Many of these findings are based upon the Stipulated Facts filed by the parties on April 22, 1997.

*Breach of Contract Claim*

1. Plaintiff Rocky Mountain Micro Systems, Inc. ("RMMI" or "Plaintiff") is a Colorado corporation.

2. Defendant Public Safety Systems, Incorporated, ("PSSI" or "Defendant") is a Virginia corporation.

3. On September 3, 1992, Defendant contracted with the City and County of Denver, Colorado, ("Denver") for the design and installation of an integrated computer-aided dispatching system ("CAD") for Denver's Fire, Police and Emergency Medical Services departments (Exhibit 2).

4. That contract provides that it expired on December 31, 1993.

5. Plaintiff entered into a subcontract with Defendant, entitled Development and License Agreement ("Agreement") and dated February 26, 1993 (Exhibit 10), whereby Plaintiff was to design and install a combination of hardware and licensed software (collectively "Interface Modules") that would pass information between Denver's existing equipment and the CAD Defendant was developing.

6. The Agreement obligated Plaintiff to:

a. "[D]eliver the Hardware to PSSI and install the Hardware at the Facilities," which were designated in the Agreement to be Denver's Combined Communications Center.

b. Arrange access to the Facilities with Denver for installation and implementation of the Interface Modules.

c. "[P]rovide prompt notice to PSSI of any actual or anticipated delays in the delivery of the Interface Modules and . . . report periodically concerning the progress of the development efforts."

d. "[D]eliver the Licensed Software for each Interface Module to PSSI within 10 days of the delivery of the Hardware for that Interface Module and . . . manage on-site installation of the Licensed Software at the Facilities."

e. "Within five days of completion of delivery and installation of each Interface Module. . . . demonstrate to PSSI, or its designated representative, the functions of the particular Interface Module."

7. Pursuant to the Agreement, Defendant was to:

a. Conduct acceptance testing of the Interface Modules for a period of thirty days, immediately following their successful demonstration.

b. Pay Plaintiff $131,730 in three installments as hereafter described.

8. It is undisputed that Plaintiff completed development of the Interface Modules by June 1994. As discussed *infra*, a meeting of the parties with Denver representatives resulted in a decision to enhance those Modules which was completed by Plaintiff by September 1994.

9. The "Status Interface Module" (see Exhibits B and C to Agreement) consists of software alone. It was delivered to Defen-

dant via modem in June 1994 for testing and demonstration.

10. The testing of the Status Interface Module went well according to the Plaintiff and Defendant's representative (Elijah Titus). Although further testing was discussed, neither Mr. Titus nor anyone else from Defendant requested further testing from the Plaintiff and Defendant never complained of any defect in that Module.

11. Sometime in September 1994, Plaintiff made the necessary arrangements with the Denver Fire Department for access to deliver and install the remaining Modules at the Combined Communications Center ("Center").

12. The installation of the remaining Interface Modules, which consisted of software and hardware, began in mid-September 1994, and was completed on or about December 30, 1994.

13. Everything was installed except for the connection to the Defendant's computer which could only be accomplished by Defendant. That connection has never been made.

14. Plaintiff testified that the testing and demonstration via modem in the summer of 1994 satisfactorily demonstrated the suitability of the Modules for Defendant's computer. That testimony was unrebutted.

15. Plaintiff otherwise demonstrated all Modules at the Center to the reasonable satisfaction of Denver Fire Department personnel.

16. Although there had been discussion of doing so, the Denver Fire Department personnel had not been formally named as the "designated representatives" of Defendant under the Agreement for purposes of demonstration.

17. Defendant was not present during the demonstrations and there is no evidence that it was given prior notice of those demonstrations.

18. Defendant did receive notice of the installation and demonstration from Plaintiff's December 30, 1994, invoice which was received by Defendant in early January, 1995 (see *infra*).

19. During 1994, Defendant had ongoing discussions with Denver for an extension of their contract which otherwise expired at the end of 1993 (see Exhibits D–2, 29, 30, 31, 32 and 33). Defendant did not give Plaintiff any notice of these discussions or of any potential difficulties.

20. In September, 1994, at about the time Plaintiff was commencing installation of the Interface Modules, Mr. Bruce Shannon of the Defendant called Plaintiff's President, Ray Burton, and told him that there had been "a little snag" in Defendant's contract with Denver, but that Plaintiff should proceed with the work on the Interface Modules rather than wait for Mr. Titus's call concerning any further testing via modem.

21. Lewis Henneke, President of the Defendant, testified that he told Mr. Shannon to give the Plaintiff a stop work order in the first part of September, 1994, but Mr. Burton's unequivocal denial that any such order was given is not rebutted by Defendant and it did not call Mr. Shannon as a witness.

22. Section 12.3 of the Agreement [1] permitted Defendant to terminate the Agreement in the event Denver terminated its contract with Plaintiff. There is no evidence that Defendant ever sought to terminate the Agreement on that basis and no notice of such termination was given to Plaintiff by Defendant as required by § 13.18 of the Agreement.

23. Ultimately, in May 1995, Denver formally notified Defendant that it was not reviving or extending the contract (Exhibit 39). Defendant did not notify Plaintiff of the city's action.

24. It is undisputed that 99% of the contract work had been performed by Plaintiff prior to delivery and installation which, combined, constitute only 1% of the work.

25. Pursuant to § 11.3 and Exhibit D of the Agreement, Plaintiff was to be paid $131,730 in three installments, with the first installment of 25% ($32,932.50) being due on the effective date of the Agreement. Defendant paid Plaintiff that amount in April 1993.

1. Hereafter, the reference to a section number is a reference to that section of the Agreement.

26. The second installment of 50% ($65,865) for the installation milestone was due upon completion of installation (December 30, 1994) and Plaintiff sent Defendant an invoice for that amount on or about December 30, 1994 (Exhibit 34).

27. Defendant returned that invoice on January 27, 1995, with a letter advising Plaintiff that the project was "currently in abeyance due to contractual differences between" Denver and Defendant (Exhibit 35).

28. Pursuant to § 4.2, Defendant had 30 days to "conduct acceptance testing" after demonstration of each Interface Module.

29. Defendant knew of Plaintiff's installation by at least January 11, 1994, but there exists no evidence that Defendant has ever tested the equipment.

30. Not hearing from Defendant following installation and demonstration (and before Plaintiff had received Defendant's January 27, 1995, letter), Plaintiff sent the third and final invoice for the acceptance milestone payment of 25% ($32,932.50) on or about January 30, 1995 (Exhibit 36).

31. Defendant invoiced Denver on or about May 3, 1995, in the amount of $106,875 to cover Plaintiff's second and third installment billings (Exhibit 38).

32. On June 13, 1995, Defendant acknowledged Denver's termination of its contract, but demanded payment for completed work, including all of the work of Plaintiff (Exhibit 40).

### Quantum Meruit Claim

33. On June 9, 1994, a meeting was held at which the Presidents of Plaintiff (Burton) and Defendant (Henneke) and representatives of Denver were present. Denver's Fire Chief requested an enhancement of the Interface Modules beyond that called for in the Agreement. Mr. Burton expressed uncertainty whether the equipment could be modified and raised a concern about costs. Denver representatives stated Denver would not pay for the enhancement.

34. Within a week, Mr. Burton advised Mr. Henneke that he could complete the enhancement within 90 days. Mr. Henneke agreed that the Plaintiff should proceed with the enhancement.

35. There was no discussion of costs and Plaintiff never presented an invoice to Defendant for the work.

36. When the Interface Modules were installed in December of 1994, they contained the enhancement requested by Denver.

37. Plaintiff's unrebutted testimony is that the cost to make the enhancement was $37,800.

38. Plaintiff's December 30, 1994, invoice (Exhibit 34) and January 30, 1995, claim (Exhibit 36) did not include any additional charge for the enhancement.

### CONCLUSIONS OF LAW

Based upon the foregoing findings of fact and the findings hereafter expressed or implied, I make the following legal conclusions:

#### Jurisdiction

1. Because the parties are of diverse citizenship and the amount in controversy requirement is met, I have jurisdiction over this action pursuant to 28 U.S.C. § 1332.

#### Contract Claim

2. Under the *Erie* doctrine, Colorado substantive law determines the respective rights and duties of the parties under their agreement and the circumstances of this case. In particular, Article II of the Uniform Commercial Code ("Code") applies because this is a transaction for the sale of goods. C.R.S. § 4–2–102. Certainly the express terms of the Agreement may change the effects of the provisions of Article II. C.R.S. § 4–1–102(3). However, where the Agreement is silent or does not modify the terms of Article II, reference should be made to its provisions to resolve any issues. *See Myers v. Koop*, 757 P.2d 162, 164 (Colo.App. 1988).

3. Pursuant to Section 11.3 and Exhibit D of the Agreement, the only condition precedent to payment of the first or "installation milestone" payment ($65,865) was installation of the Interface Modules "at the Facilities", i.e. the Denver Combined Communications Center (*see* Section 3.3).

4. Based upon the language of Section 3.3 that Plaintiff "shall deliver the Hardware to PSSI and install the Hardware at the Facilities ...", Defendant claims an additional condition of a separate delivery to it, distinct from the installation. However, that language can also be read to require delivery and installation to occur "at the Facilities" and I reject Defendant's argument. Since the Modules could only be delivered by installation, it is commercially unreasonable to read the Agreement to require two separate installations (*see* C.R.S. § 4–2–311(1)).

5. I conclude that delivery was completed when the Modules were installed and Defendant was given notice of the delivery by Plaintiff's December 30, 1994, invoice. *See* C.R.S. § 4–2–503(1) and (2) and C.R.S. § 4–2–401(2)(b) (transfer of title). Thus, even if delivery were an additional condition, it was satisfied.

6. Accordingly, I conclude that the installation milestone payment of $65,865 is owed Plaintiff. The due date was 30 days after the date of Plaintiff's December 30, 1994, invoice or January 29, 1995. Section 11.3.

■ 7. Defendant's failure to pay was a material breach of the Agreement. Section 11.3.

■ 8. The second milestone payment ($32,932.50) was conditioned upon acceptance of the Interface Modules by Defendant. Section 11.3 and Exhibit D.

9. Section 4 established the acceptance procedures. First, Plaintiff was to demonstrate the functions of the Modules to Defendant within five days of installation. Section 4.1. After successful demonstration, Defendant would have 30 days to conduct acceptance testing. Section 4.2. At both stages Plaintiff would have the opportunity to cure any noted deficiency and if none were reported during the acceptance period, the Modules were deemed "accepted." Section 4.2(a).

10. A partial demonstration and acceptance of the Modules was accomplished for the Status Interface Module in June 1994, and no deficiency was noted.

11. The balance of the Modules were demonstrated to the satisfaction of City rep-

resentatives, but those representatives were not designated representatives of the Defendant pursuant to the contract.

12. Nevertheless, I conclude that Defendant accepted the Modules for the following reasons:

(a) The purpose of the acceptance process was to discover and remedy any deficiency.

(b) Although notified of the installation, Defendant never gave any notice of deficiency and, hence, Plaintiff was given no opportunity to cure any deficiency.

(c) Since no timely notice was given, acceptance is deemed to have occurred under Section 4.2(a).

(d) Not only did Defendant fail to give notice, it acted as if it had fully accepted Plaintiff's performance by billing Denver for the two milestones in May 1995 (Exhibit 38), and then, following termination, demanding payment from Denver for those milestones as "work completed". (Exhibit 40).

■ (e) Defendant, like every buyer of goods, has the basic obligation to accept the goods (C.R.S. § 4–2–301) and should not be allowed to frustrate any of Plaintiff's remaining performance by Defendant's own inaction. When, as here, the Defendant's cooperation was necessary for any remaining part of Plaintiff's performance, but it was not "seasonably forthcoming", then Plaintiff may "perform in any reasonable manner". C.R.S. § 4–2–311(3)(b). Given the circumstances of this case, Plaintiff's election to proceed with installation and demonstration at the Facilities was commercially reasonable performance (*see* Official Comment 3 to C.R.S. § 4–2–311), a fact confirmed by Defendant's billing of the City for Plaintiff's installation.

(f) Defendant's conduct following installation constituted acceptance of the goods under the Code because it failed to timely reject the goods (see below) (C.R.S. § 4–2–606(1) and (b)) and acted inconsistent with Plaintiff's continued ownership (C.R.S. § 4–2–606(1)(c), Official Comment 4).

(g) Like any buyer, Defendant also had the right to reject non-conforming goods (C.R.S. § 4–2–601(a)) so long as Defendant seasonably notified the Plaintiff, i.e. within a

reasonable time of delivery or tender. C.R.S. § 4–2–602(1). Defendant did not timely reject the goods [2] and its ultimate position in this litigation of non-acceptance or rejection was not "seasonable."

(h) Defendant's failure to seasonably reject also denied Plaintiff the opportunity to cure any defect in its performance which itself precludes Defendant from claiming breach or rejection. C.R.S. § 4–2–605(1)(a).

13. Accordingly, I conclude that the acceptance milestone payment of $32,932.50 is owed Plaintiff by Defendant. The due date was 30 days after the date of Plaintiff's January 30, 1995, invoice or March 1, 1995. Section 11.3.

14. Defendant's failure to pay the acceptance milestone was a material breach of the Agreement. Section 11.3.

15. Given the uncontested testimony that Plaintiff had performed 99% of its work prior to installation and° that it had then completed installation except for any repeated demonstration and plugging in Defendant's CAD system, which only Defendant could do, Plaintiff virtually completed its performance. Therefore, Plaintiff would also be entitled to recover under the doctrine of substantial performance. *Western Distributing Co. v. Diodosio,* 841 P.2d 1053 (Colo. 1992); *Fenner & Shea Construction Co. v. Wadkins,* 32 Colo.App. 364, 511 P.2d 924 (1973). Any unperformed portion of Plaintiff's performance is *de minimis* and no evidence was presented to reduce Plaintiff's recovery.

### Quantum Meruit Claim

16. To recover under a theory of *quantum meruit,* Plaintiff must minimally prove that it rendered services to Defendant expecting to be compensated and Defendant accepted the services knowing of that expectation. *Hansen v. GAB Business Serv., Inc.,* 876 P.2d 112, 114 (Colo.App.1994); *Britvar v. Schainuck,* 791 P.2d 1183, 1184 (Colo.App. 1989); *Schuck Corporation v. Sorkowitz,* 686 P.2d 1366, 1368 (Colo.App.1984).

2. Defendant's January, 1995, letter (Exhibit 35) declaring that the project was "in abeyance due to contractual differences" with Denver was not

17. Here, there was no discussion of cost or expectation of payment. In fact, when Plaintiff submitted invoices for the latter two milestone payments, it did not include any charge for the enhancements and Plaintiff never otherwise billed Defendant for that work, evidencing that Plaintiff did not expect payment for that work. Accordingly, Plaintiff's *quantum meruit* claim fails.

### Prejudgment Interest

18. Pursuant to C.R.S. § 5–12–102(1)(b), a prevailing party in a breach of contract action may recover prejudgment interest at annual rate of 8% from the time the money was due until the time judgment is entered. *Mesa Sand & Gravel Co. v. Landfill, Inc.,* 776 P.2d 362, 363–64 (Colo.1989). Accordingly, interest at the rate of 8% is due on the payments from the due dates set forth above.

### Attorneys Fees and Costs

19. The parties agreed that, in the event of any damage claim resulting from alleged breach of the Agreement, the "non-prevailing party shall be liable for costs and reasonable attorney fees incurred by the prevailing party in any dispute arising out of any such claim." Section 12.2.

20. I conclude that both Plaintiff's contract and *quantum meruit* claims are disputes arising out of such damage claims, Accordingly, Plaintiff is entitled to recover its reasonable costs and attorney fees in connection with its contract claims and Defendant is entitled to recover its reasonable costs and attorney fees for defending the *quantum meruit* claim.

### ORDER AND JUDGMENT

Accordingly, it is ORDERED as follows:

1. Judgment is entered in favor of Plaintiff Rocky Mountain Micro Systems, Inc. and against Defendant Public Safety Systems, Inc. in the principal amount of $98,797.50 on Plaintiff's breach of contract claim.

a rejection and the Defendant's later billings were only consistent with acceptance, not rejection.

2. Judgment is entered in favor of Plaintiff Rocky Mountain Micro Systems, Inc. and against Defendant Public Safety Systems, Inc. on Plaintiff's claim to interest at the rate of 8% compounded annually on $65,865 from January 29, 1995, until the date of this judgment and on $32,932.50 from March 1, 1995, until the date of this judgment.

3. Judgment is entered in favor of Defendant Public Safety Systems, Inc. and against Plaintiff Rocky Mountain Micro Systems, Inc. on Plaintiff's *quantum meruit* claim;

4. Judgment is entered in favor of Plaintiff Rocky Mountain Micro Systems, Inc. and against Defendant Public Safety Systems, Inc. for Plaintiff's reasonable attorneys fees and costs incurred in connection with its contract claims.

5. Judgment is entered in favor of Defendant Public Safety Systems, Inc. and against Plaintiff Rocky Mountain Microsystems, Inc. for Defendant's reasonable attorney fees and costs incurred in connection with its defense of Plaintiff's *quantum meruit* claims.

6. Each party shall file its bill of costs and affidavits for attorney fees consistent with this Judgment within 15 days of the date hereof and each party may respond to the other's filing within 15 days thereafter.